STATE OF NORTH CAROLINA v. JESSE COLBERT SMITH, JR.

No. 728SC666

(Filed 20 December 1972)

1. Homicide § 21— involuntary manslaughter — sufficiency of evidence

    The State's evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of involuntary manslaughter where it tended to show that deceased and another were looking at a junked automobile in a field, that defendant was planting corn in an adjacent field and obtained his high-powered rifle to shoot at blackbirds, that defendant had earlier seen someone around the old car, that defendant aimed the rifle at the car and fired a shot, and that the bullet penetrated a bumper and fender of the car and struck deceased in the head.

2. Criminal Law § 75— statements to officer at crime scene — failure to give defendant constitutional warnings

    The trial court did not err in allowing an officer to testify as to statements made to him by defendant before defendant was warned of his constitutional rights where the statements were made at the crime scene in answer to the officer's general question to determine what he was to investigate, and there was no objection to the testimony at the trial.

APPEAL by defendant from *Cowper, Judge,* 21 February 1972 Session of Superior Court held in GREENE County.

Defendant was charged in a bill of indictment, proper in form, with the felony of murder. He was placed upon trial on the lesser included offense of second degree murder, and was convicted of involuntary manslaughter.

The State's evidence tended to show the following:

On 16 April 1971 Johnny Smith, the deceased, and a companion, Roosevelt Wilkes, were working on a farm. They decided to look over a "junked" Cadillac automobile which was located in the edge of a field on defendant's father's land on the other side of a small patch of woods from where they were working. Deceased and his companion walked through the woods and out into the edge of the field to the "junked" automobile. They raised the hood to look at the size of the engine. Then deceased sat down in the driver's seat while Roosevelt stood beside the driver's door. Roosevelt looked across the top of the car and saw defendant prop a rifle against the clothesline post in defendant's father's yard and point the rifle towards Roosevelt and deceased. Roosevelt told deceased to "look out that someone

had a rifle pointed at us." Roosevelt and deceased "jumped down" beside the car. Deceased crawled to the rear of the car and peeped out. "When he peeped out there, he told me they still had the rifle and he told me not to run. Then he looked back out of the back of the car, and I heard something go pow, and Smith fell and groaned. I called him three times and he didn't answer me. He was lying back of the car." Roosevelt ran back through the woods and had someone call the rescue squad.

At the time in question, defendant was helping his father to plant corn in a field adjacent to the field in which the "junked" Cadillac automobile was located. Defendant observed some blackbirds scratching in the field where they had sowed corn. He went into his father's house and secured his 30.06 caliber rifle. The rifle was equipped with a telescopic sight. The "junked" automobile was two hundred and thirty seven yards from defendant's father's house and the blackbirds were about eight yards from the automobile. Defendant earlier had seen someone around the old car. Defendant propped the rifle on the clothesline post and fired one shot at the blackbirds. The birds flew away and shortly thereafter he saw someone run from the car to the woods. Defendant called his father and told him "something was wrong down there around the car, and he thought they should go down to the car and see if anything was wrong." Defendant and his father went to the car and found Johnny Smith; he had been hit in the head by the rifle bullet. The projectile had penetrated the bumper and fender before striking deceased.

Defendant's evidence tended to show the following:

On the day in question, defendant was helping his father plant corn. Some blackbirds were in the field scratching where corn had been sowed and defendant took his 30.06 caliber rifle from the house to shoot at them. Defendant had not seen anyone around the "junked" automobile and had no idea anyone was there. The blackbirds were across the ditch from the field in which the "junked" car was located. Defendant propped the rifle against the clothesline post and fired one time at the blackbirds. A short time after that he saw someone run from the car and he called his father to go with him to check the other end of the field. "I told him I had seen someone leave from that area around the car." When defendant and his father

reached the car they saw deceased lying there. That was the first time defendant had seen the deceased.

From his conviction, defendant appealed.

*Attorney General Morgan, by Associate Attorney General Haskell, for the State.*

*Turner & Harrison, by Fred W. Harrison, for the defendant.*

BROCK, Judge.

[1] Defendant assigns as error the denial of his motion for nonsuit. It is defendant's contention that, although he fired the rifle intentionally, he did not aim it at the deceased. Clearly, the State's evidence tends to show that defendant aimed the rifle at the car whether he intentionally aimed it at the deceased or not. Also, the State's evidence tends to show that defendant saw someone around the old car before he fired the shot.

A rifle which fires a projectile at sufficient velocity to penetrate a bumper and fender at two hundred and thirty seven yards distance and still strike a person with sufficient force to penetrate his skull, is clearly a high-powered rifle. It seems absurd to have fired such a weapon at a mere blackbird. Defendant's protestations now, that he had never fired the rifle before and did not know much about it, seem to emphasize a careless and reckless use of the rifle.

"Any careless and reckless use of a loaded gun which jeopardizes the safety of another is unlawful, and if death results therefrom it is an unlawful homicide." *State v. Brooks,* 260 N.C. 186, 132 S.E. 2d 354. "The unlawful killing of a human being, unintentionally and without malice, proximately resulting from some act done in a culpably negligent manner, when fatal consequences were not improbable under the existing circumstances, supports a verdict of guilty of involuntary manslaughter." *State v. Curtis,* 7 N.C. App. 707, 173 S.E. 2d 613.

Defendant next assigns as error that the investigating officer was allowed to testify as to statements made by defendant. Defendant contends he was not advised of his rights before making the statements.

[2] The officer testified that when he arrived at the scene there were a lot of folks standing around. He knew defendant

State v. Smith

and asked him what happened. "He said he was shooting a rifle at some birds, and the bullet hit the ground, ricocheted, and hit a man. He said that prior to firing the rifle he had seen some people around the old car. He told me the rifle was a 30.06, and he went and got it for me." The record discloses no objection to the testimony, but in any event it was a general question to determine what the officer was to investigate. Defendant was not a suspect nor was he being interrogated. Immediately thereafter, and before any interrogation, the officer testified that he advised defendant of his rights and took him to the office for further questioning. Defendant was not arrested, but, with defendant's consent, was lodged in jail for the night for defendant's protection. After further investigation, defendant was charged with murder and placed under arrest. The record discloses that no objection was made during the officer's recitation of what defendant stated to him. It seems that at trial defendant was satisfied that he had been sufficiently warned of his rights. This assignment of error is overruled.

Defendant strenuously argues that a discrepancy between the officer's notes as to what defendant stated and the officer's testimony as to what defendant stated entitled him to a new trial. This discrepancy was fully brought out by defendant and was considered by the jury. It was for the jury to determine which version of defendant's statements it would believe.

We have examined defendant's remaining assignments of error and find them to be without merit. In our opinion defendant had a fair trial and the case was submitted to the jury upon appropriate principles of law.

No error.

Chief Judge MALLARD and Judge BRITT concur.